## SMITH v. SPRINGDALE AMUSEMENT PARK, Limited, et al.
### No. 485.

District Court, S. D. Ohio, W. D.
June 23, 1928.

John E. Sater, of Columbus, Ohio, and E. Howard M'Caleb, of New Orleans, La., for complainant.

Paul Bakewell, of St. Louis, Mo., and J. W. Heintzman and William E. Hess, both of Cincinnati, Ohio, for defendants.

HICKENLOOPER, District Judge.

The motion to dismiss the bill of complaint as to the individual defendants H. C. Records and G. W. Heintz must be granted. These defendants are not inhabitants of this district, nor does it appear that they have committed acts of infringement and have a regular and established place of business here. The motion to dismiss the bill as regards the individual defendants Paul M. Williams and Gerald Brown must be overruled.

From the affidavits on file, it appears that the defendant Brown has participated in the alleged infringement by use, by acting as a judge of dog races conducted at the Springdale Amusement Park, within this district, and that he maintained a regular and established place of business at such park, as regards said employment. It also appears that the defendant Paul M. Williams was one of the partners in the maintenance of the Springdale Amusement Park and, as such, has participated in and contributed to the infringement and has maintained a regular and established place of business, as regards said partnership, at said amusement park. Personal service was made upon Williams and Brown, and it is therefore apparent that the court has personal jurisdiction over said defendants and, likewise, venue in said action. The admissions made in the affidavits on the motion to dismiss, said affidavits being made by the said defendants Williams and Brown personally, operate in lieu of evidence at the trial and constitute sufficient grounds for holding said defendants.

Coming to the merits of the action, it involves the question of validity and infringement of three patents issued to Owen P. Smith; No. 1,379,224, granted May 24, 1921, for improvement in dog racing amusements; No. 1,507,440, granted September 2, 1924, for improvement in housing for conveyor cars and tracks; and No. 1,507,439, granted September 2, 1924, for improvement in starting cages for racing dogs. Each of these patents will be considered separately, and in the order above given. As to each patent, the defenses are invalidity on the ground of anticipation and lack of invention, and non-infringement due to estoppel arising from the Patent Office proceedings.

### Patent No. 1,379,224.

Claims 1 and 2 of this patent are in issue. Claim 1 provides:

"In a dog racing amusement, a race course suited for dogs, a casing extending around the outer side of the race course and provided with a longitudinal opening, a mechanical conveyor including a track extending around the race course and located within the casing, and a conveyor car mechanically operated upon said track and provided with an arm extending through the longitudinal opening of the casing in a projecting position over the track and adapted to carry a lure, and a wheel rotatably mounted on and supporting the arm at the projecting end thereof."

Claim 2 differs from claim 1 only by describing the horizontally extending arm as "hinged to said car," and by providing as one element of the combination "a covered rail track adjacent said course on one side" instead of "a casing extending around the outer side of the race course."

In order to secure a test of speed for the dogs it had long been known that an artificial lure might be used, and that all that was necessary was to carry such artificial lure around the track in advance of the dogs and at their estimated maximum speed. It had also long been known that some means must be provided for preserving the lure from destruction at the end of the race, by concealment. This feature is claimed in other claims, but is not here involved. Electric motor-driven conveyors were also in use for this purpose prior to Smith, but he seems to have been the first to realize that the lure could be carried upon the end of a horizontally extending arm without adding fatally to the appearance of artificiality and without detracting the attention of the dogs from such lure. The prior art patents seem to indicate a belief that the lure must be dragged upon the ground by a rope, as in patent to Pinard, No. 362,396, May 3, 1887, or supported by a single vertical rod passing through the slot of an underground tunnel, as in patent to Everett, No. 1,052,807, February 11, 1913, and patent to Smith, No. 1,038,504, September 10, 1912. The British patent to Moss, No. 9058, July 4, 1896, occupied a position midway between these two in that the track upon which the lure was propelled was located on the race course proper, an overhead trolley supplied for furnishing electric current, and the lure carried the motor and operated by one wheel upon a single rail, being held in position by flanges at the rail and trolley wire.

The only patent reference in anywise anticipating the patent in suit was the patent to Walsh, No. 611,876, October 4, 1898. The device of this patent included the electrically propelled conveyer car adjacent the track and separated therefrom by a fence, an artificial lure which dragged upon the track, and a laterally extending arm to which the platform bearing the lure was attached by a rope. While the patent to Walsh disclosed no casing or cover for the conveyer tracks, the fence would sufficiently obscure the conveyer from sight of the dogs, and the covering, as a protection from the elements and as preventing short-circuiting of the third rail, would in no way co-operate in a successful

race, or involve invention, but provision for it would seem to constitute mere aggregation. Upon the question of anticipation, therefore, the advance of Smith over Walsh and the only novel conception which might distinguish the two patents was that the laterally extending arm was made horizontal, or nearly so, the conveyer track placed at a level below the race track so that the arm might extend out in close proximity to the ground, and the lure placed directly upon the end of the extending arm instead of being dragged upon the track. Smith does not specifically teach that his principal discovery was that the arm would not detract the attention of the dogs from the lure, or that there was any advantage in not dragging the lure upon the track, but in supporting it directly upon the outwardly extending arm, and upon this alone, are we of the opinion that there was any advance whatever in the art of coursing or dog racing. The lowering of the level of the conveyer tracks, and hence of the fence or partition separating the conveyer from the race course, necessarily required the covering or incasing of the conveyer and the tracks so that the dogs might be prevented from jumping upon the track and being injured by the third rail. By this casing the public was also excluded from the tracks. These, however, were mere incidents necessitated by and growing out of the use of the laterally extending arm as support for the lure which constituted the real element of advance over Walsh.

■ The elements of the combination of the patent in suit were all old, but the combination was new. The novel conception of supporting the lure directly upon the outwardly extending arm vitalized the whole device considered as the entirety of the several elements. In assembling these old elements in the manner described, Smith accomplished a new result in dog racing paraphernalia in that his device was effective, safe for the dogs and the public, avoided any possibility of the supporting platform for the lure turning over (as in Walsh), was economical in construction, and was easily inspected and repaired. To this extent we do not believe that Walsh anticipated Smith, or that the combination claimed was a mere aggregation. Practically all the elements of the combination co-operated in the final result, the accomplishing of a successful and safe race. It is not necessary that the inventor fully understand the scientific principles underlying his invention, or the trend of animal or human psychology and temperament which underlie its success.

It is sufficient if the disclosures made possess the elements of novelty and utility.

Although novelty and utility are apparent in the combination of the patent, the question still remains whether in so assembling the elements of his combination the patentee disclosed invention or merely the exercise of a high degree of mechanical ability. In other words, having the patent to Walsh before him, would the complainant's device naturally occur to one skilled in the particular art? The line of demarcation between mechanical skill and invention is so vague and indefinite that there has been a marked tendency in recent years to attribute invention to those devices which are both new and useful, unless they are the obvious results of natural development in the art and would quite manifestly occur to one familiar with the art. Considered in this light, we are not prepared to hold the patent invalid for want of invention.

■ The question of infringement involves a construction of the patent claims, and a consideration of the Patent Office proceedings. Smith was not a pioneer in the invention of dog race track devices in which an artificial lure was provided in lieu of live animals. He was perhaps a pioneer in promoting the construction of dog race tracks as profit-making enterprises but, in view of the patent to Walsh, and the fact that all his own patents are for improvements only, the form and method of operation of the combination claimed, or the device disclosed, would seem to be of the very essence of the invention. In any event, the patent is a very narrow one, and the range of equivalents to be allowed the patentee is correspondingly limited. Rev. St. § 4888 (35 USCA § 33), requires that the patentee shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery. This is not a mere idle statutory provision, but the claim is the measure of the right to relief. McClain v. Ortmayer, 141 U. S. 424, 12 S. Ct. 76, 35 L. Ed. 800; American Roll Gold Leaf Co. v. W. H. Coe Mfg. Co., 212 F. 720 (C. C. A. 1). While the greatest advance and perhaps the true inventive step of the patent in suit consisted of supporting the lure directly upon the extending arm, it is apparent that Smith did not realize this. In order to provide for the entrance of the lure into a den upon a straight course at the end of the race, the device disclosed by Smith passed around the outer side of the race course. If the track was even slightly banked on the curves, the

lure would perceptibly leave the ground upon such curves and in direct proportion to the angle of banking. This accounts for the voluntary limitation in claim 1 that the casing shall extend around the outer side of the race course and that the arm shall carry a wheel rotatably mounted thereon and supporting it, implying flexibility, or the hinge at the end attached to the conveyer, and for the similarly descriptive limitation of claim 2 of a horizontally extending arm "hinged to" said conveyer and a wheel rotatably mounted near the end of said arm. To the inventor each of these elements seemed to pertain to the inventive step, and to perform a substantial and necessary function which the patentee considered of importance. Viewed in this light, the question is one of voluntary limitation rather than estoppel. D'Arcy Spring Co. v. Marshall Ventilated Mattress Co., 259 F. 236 (C. C. A. 6); Lakewood Engineering Co. v. Stein et al., 8 F.(2d) 713 (C. C. A. 6).

While courts are disposed to give to a patentee the full benefit of the true advance made in the art, and an adequate range of equivalents which will so protect the patentee (Winans v. Denmead, 15 How. 330, 14 L. Ed. 717; compare Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 63, 43 S. Ct. 322, 67 L. Ed. 523; Dowagiac Mfg. Co. v. Brennan & Co., 127 F. 143, 147 [C. C. A. 6]; W. W. Sly Mfg. Co. v. Russell & Co., 189 F. 61 [C. C. A. 6]), this doctrine has no application to a patent for an improvement pure and simple where the patentee claims only as his invention or discovery a combination of elements all of which, in his opinion, are necessary to produce an operable device, and of great importance and the substance of his invention. Having so voluntarily limited himself, the patentee is entitled to claim infringement only by devices incorporating all the elements of the combination claimed. Here the device of the defendants does not have "a casing extending around the outer side of the race course" or a "wheel rotatably mounted on the extending arm and supporting such arm," within the language of claim 1, nor "an extending arm hinged to the conveyer and a wheel rotatably mounted near the end of said arm," within the language of claim 2.

But, even if within the otherwise normal range of equivalents, we are of the opinion that the patentee has estopped himself in the Patent Office proceedings to claim such equivalents. The original application for patent contained the following claim:

"3. In an amusement, the combination of a race track suited for dogs, a covered rail track adjacent said course, a conveyer car mechanically operated upon said track, *an arm attached to said car extending midway of said course,* a wheel rotatably mounted on said arm, *and a lure mounted on said arm.*"

This claim was rejected on reference to Walsh, and was amended by adding at the end:

"and a casing extending around the race course and receiving and concealing the track and the conveyer car and provided with a longitudinal opening through which the said arm extends."

The claim as amended was again rejected "on either Walsh or Moss both of record. Moss is provided with a housing and it would not be invention to provide Walsh with one." The claim was then amended to read as, and became, claim 1 of the patent as issued. It was not pointed out to the examiner that there was any invention in supporting the lure upon the outwardly extending arm and, in so acquiescing in the rulings of the Patent Office, and after abandoning the broad claim and substituting a claim to a specific structure only, the patentee "may not by construction, or by resort to the doctrine of equivalents, give to the claim the larger scope which it might have had without the amendments, which amount to a disclaimer." I. T. S. Rubber Co. v. Essex Rubber Co., 272 U. S. 429, 444, 47 S. Ct. 136, 141, 71 L. Ed. 335; Weber Electric Co. v. Freeman Electric Co., 256 U. S. 668, 677, 41 S. Ct. 600, 65 L. Ed. 1162. Not only do such Patent Office proceedings make form and structure of the essence of the inventive step, but an estoppel is also raised against the patentee from claiming, by resort to the doctrine of equivalents, that the claim as allowed has the same breadth and scope as the rejected claim. As said by the Supreme Court in the I. T. S. Rubber Company Case, to permit this "would render nugatory the specific limitation" upon which the claim was granted. If dissatisfied with the ruling of the Patent Office, the applicant's remedy was by an appeal. Having limited and narrowed his claim, he is bound by it.

We are aware that this view was not followed by the district court for the Eastern District of Louisiana (Smith v. American Electric Rabbit Racing Association, Inc., et al., 21 F.(2d) 366), but apparently the questions of voluntary limitation and estoppel by Patent Office proceedings were not raised at that trial nor otherwise called to the attention of the court. Neither of the above cases last cited are referred to by the court, and the opinion seemingly rests upon the doctrine of

96

Winans v. Denmead, supra, and related cases. This opinion of the district court was affirmed by the Circuit Court of Appeals for the Fifth Circuit (26 F.(2d) 1016), but in an opinion saying only that the patents in suit and infringing devices are fully described in the opinion of the district court and need not be repeated, and that "we agree with the conclusions of· the District Court." The latter opinion is not helpful upon the point here considered. Notwithstanding our high regard for the learned district judge for the Eastern District of Louisiana, and for the opinions of the Circuit Court of Appeals for the Fifth Circuit, we are unable to concur in the decisions so rendered.

The alleged infringing device of the defendants having entirely omitted from the combination the elements included in the limitation and estoppel, we are constrained to hold that infringement has not been shown.

### Patent No. 1,507,440.

█ This patent is for a housing for cars and tracks of the conveyer. The device shown in this patent would seem to possess neither the elements of novelty nor invention. Entirely apart from anticipation by prior patent, the invention would seem to be anticipated by such structures in common use as the well-known housing for the third rail on electric railways, the covering for loading platforms adjacent freight railway tracks at large industrial plants, or even the canopies at entrances to hotels, theaters, or residences. Assuming the desire to house, the construction of such housing was a mere question of mechanical skill not justifying separate patent therefor, whether termed the housing, casing, or roofing. It was devised and constructed solely by application of known principles of truss and cantilever structures. Except as an old element forming part of a new combination in race track amusements, no invention is apparent in the disclosures made. The drafting of the claims, with specific reference to housing for covering tracks and cars having laterally extending arms, is but the designation of a specific and possibly new use for a common and well-known structure.

Not only is the device of this patent anticipated by many ordinary structures, but it ·is also anticipated by the patent to Bertram, No. 729,120, May 26, 1903. The mere fact that the motor in the Bertram patent is outside the casing, and the third rail alone inclosed, would seem insufficient to distinguish the reference from the Smith patent, in so far as a patentable casing itself or article patent is concerned.

Reference to the Patent Office proceedings also discloses the abandonment of any claim not incorporating the element of the adjustable truss or stay rods. Original claims 1, 3, and 4, even as amended, omitted the element of this adjustable truss rod, were rejected upon reference to Bertram, and were then amended so as to include this element which was apparently the only advance in the art. Bertram showed one type of construction for an identically shaped casing; the patent to Smith, No. 1,379,224, shows another type of construction; and the device used by the defendants herein shows still another. Under the doctrines of limitation and estoppel discussed with reference to the Smith patent, No. 1,379,224, the patentee must be held to a monopolistic right only in the specific manner of construction shown. As so limited, the device of the defendants clearly does not infringe.

### Patent No. 1,507,439.

This patent relates to a starting cage for racing dogs in which the single claim is:

"In a starting cage for racing dogs, a frame comprising a box-like structure divided into a plurality of compartments and comprising walls formed of wire mesh partially covered with fabric, individual rear doors for each of the compartments and a single front door hinged at its upper end to the top walls of the frame, divergent inclined members secured to the top of the said frame and extending upwardly and outwardly beyond the face of the front door and having their outer ends in the plane of the side walls of the box-like structure, springs secured to the outer ends of said inclined members and to the door and lying in the plane of the hinges, and a latch at the bottom of the cage for coaction with the lower edge of the front door to hold the front door normally closed against the tension of said springs, said springs adapted to raise the front door upon release of the latch."

The elements of the alleged invention were therefore a box-like structure divided into a plurality of compartments, the walls of which were formed of wire mesh partially covered with fabric, individual rear doors for each compartment, and a single front door which might be raised, thus simultaneously opening all compartments forwardly. This single front door is raised upwardly and outwardly by springs upon the release of the latch, which springs are held in place by divergent inclined members. In the Patent Office proceedings, the elements which apparently impressed the patentee as constituting his in-

vention were (1) the wire mesh partially covered with fabric, and (2) the divergent inclined members supporting the springs. While devised with particular reference to horse racing, the patent to Escudé, No. 731,-347, June 16, 1903, provided the upwardly and outwardly swinging unitary front door; and all claims of the original application having been rejected on patents to Whitehead, No. 529,987, November 27, 1894; Andrew, No. 543,762, July 30, 1895; Stitzer, No. 868,-029, October 15, 1907; Stedeker, No. 647,166, April 10, 1900; and Escudé, No. 731,347, June 16, 1903, the applicant amended by emphasizing these divergent inclined members extending beyond the face of the cage, saying:

"None of the references show the divergent inclined members having their outer edges in vertical alignment with the side walls of the box-like structure. A material advantage is gained by this structure in view of the fact that the springs being connected to these outer ends lie in the same plane as the hinge members by means of which the door is secured to the frame. This provides for a direct action of the springs the moment the latch is released."

This claim was again rejected upon Andrew and Stitzer "in view of Escudé, which suggests the 'single front door,' springs and latch." The applicant again resorted to amendment by canceling the claim and inserting a new claim for the element "a frame comprising a box-like structure divided into a plurality of compartments and comprising walls formed of wire mesh partially covered by fabric," etc. The claim was again rejected as not supported by the original disclosure, and a new amendment was made specifically stating that the front door was provided with a latch. As ultimately amended, the claim was allowed.

It is now contended that the patents for horse starting devices have but little or no application to devices for the starting of dog races, but the complainant would seem estopped to now raise this issue in view of the acceptance of such references without objection in the Patent Office. As repeatedly amended to avoid references in the prior art, it is manifest that the claim can be given but narrow construction, and only those combinations which include all of the elements would infringe. The case is not one of showing the preferred form but is one of limitation of the scope of the invention by the prior art and Patent Office proceedings, and by the estoppel arising from such proceedings. So construed, if there be any invention in the patent, it must consist either in some supposed advantage in the use of wire mesh and the divergent arms supporting the springs, or in the combination of these elements with a single exit door as distinguished from separate doors simultaneously opening; or perhaps in the single exit door opening outwardly and upwardly in combination with such other elements. Such outwardly and upwardly opening exit door is shown in the patent to Escudé, and probably in the patent to Stedeker. A barrier which is released by outward and upward movement, but unassociated with separate stalls or compartments, is in common use at probably all horse racing tracks.

In view of the prior art, starting devices having all the elements of separate compartments, separate rear doors and a single exit door opening upwardly and outwardly, and especially in view of the limitation and estoppel arising in the Patent Office, the choice of divergent spring supports and wire mesh partitions would seem to lie solely within the domain of selection of mechanical means and structural material. Invention does not seem to be disclosed by the combination of these several elements, nor by the use of the devices of horse racing in dog racing for which they are peculiarly suited. But if invention appears at all, and the patentee is limited to the specific structure shown, the patent is of very narrow scope and, as such, is not infringed by the defendant's cage which omits the wire partitions covered with fabric, the divergent inclined spring supports, and apparently the springs themselves (see Defendants' Exhibits E and F). In lieu of springs, the single front door is opened manually with the assistance of counterweights. By reason of the omission of these several elements of the combination, we are constrained to hold that this patent is not infringed.

Upon all patents a decree may be prepared dismissing the bill of complaint for want of infringement.

We have the less regret at this outcome because the court cannot fail to take judicial notice of the fact that these dog races are not conducted in the spirit of sportsmanship, but almost exclusively as gambling means. The sport, so-called, appeals almost exclusively to the gambler, and not to the sportsman or dog fancier. The most undesirable type of citizen is attracted and catered to, and not the sportsman who derives pleasure in seeing a test of speed. Knowing this to be the fact, a court of equity is here asked to lend its aid in securing for complainant a share in the

spoils of such enterprise. The entire enterprise being unconscionable, a court of equity should not order an accounting of profits made even if infringement existed. It is not a case of a possible misuse of an innocent device, but of the patentee taking out his patent and promoting the enterprises established under it solely, or primarily, at least, as gambling establishments. While a substantial good would come to the community by the injunction alone, the accounting could not in any event be ordered.